IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

NOV 16 2022

BY
DEPUTY_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 6:22-CR-64 |
| | § | JUDGE JDK/JDL |
| RANDALL V. RULE (01) | § | |
| GREGORY C. NYSEWANDER (02) | § | |

## **FIRST SUPERSEDING INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

### **General Allegations**

At all times relevant to this First Superseding Indictment:

<u>Defendants</u>

1.     **Randall V. Rule** resided in or around Kamas, Utah, within the District of Utah, and Missoula, Montana, within the District of Montana.

2.     **Gregory C. Nysewander** resided in or around Jacksonville Beach, Florida, within the Middle District of Florida.

<u>Financial Institutions</u>

3.     Ameris Bank (Ameris Bank) was a "financial institution," as defined by Title 18, United States Code, Section 1956.  It was based in Marietta, Georgia, within the Northern District of Georgia.

4.     Wells Fargo Bank, N.A. (Wells Fargo) was a "financial institution," as defined by Title 18, United States Code, Section 1956.  It was based in San Francisco, California, within the Northern District of California.

5.      America First Credit Union (AFCU) was a "financial institution" as defined by Title 18, United States Code, Section 1956.  It was based in Riverdale, Utah, within the District of Utah.

6.      Mountain America Credit Union (MACU) was a "financial institution" as defined by Title 18, United States Code, Section 1956.  It was based in Sandy, Utah, within the District of Utah.

7.      Stockman Bank of Montana (Stockman Bank) was a "financial institution" as defined by Title 18, United States Code, Section 1956.  It was based in Miles, Montana, within the District of Montana.

Terminology

8.      Romance scams target persons looking for romantic partners or friendship on dating websites and other social media platforms.  The scammers may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammers to cultivate relationships with prospective romance scam victims.  Victims may be convinced to provide money or gifts to the scammers or may be asked to conduct financial transactions on behalf of the scammers.

9.      Another common scam is a real estate scam.  One type of a common real estate scam occurs when the victim has property advertised and is contacted by an interested party.  Once the rental price is agreed upon, the scammer sends a check for the deposit.  The check covers housing expenses and is either written in excess of the amount required, with the scammer asking for the remainder to be remitted back, or for the correct amount, but the scammer backs out of the rental agreement and asks for a refund.  Because banks do not

usually place a hold on the funds, the victim has immediate access to them and believes the check has cleared.  In the end, the check is found to be counterfeit and the victim is held responsible by the bank for all losses.

10.     A second type of a common real estate scam involves real estate that is posted via classified websites.  The scammer duplicates postings from legitimate real estate sites, alters them, and reposts them.  Often, the scammers use the broker's real name to create a fake e-mail address, which gives the fraud more legitimacy.  When the victim sends an e-mail through the website inquiring about the home, they receive a response from someone claiming to be the owner.  The "owner" typically claims he and his wife are working in a foreign country and are interested in selling their home or renting their home while they are away.  If the victim is interested in purchasing or renting the home, he or she is asked to send money to the "owner" in the foreign country.  These funds are directed to the scammer or others acting on the scammers' behalf, and the would-be purchaser or renter loses his or her money.

11.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

12.     Bitcoin (BTC) is a type of cryptocurrency.

# COUNT 1

<u>Violation</u>:  18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)

1.      The General Allegations section of this indictment is realleged and incorporated by reference as though fully set forth herein.

2.      From in or about January 2020, and continuing through in or about March 2022, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the defendants, **Randall V. Rule** and **Gregory C. Nysewander**, did knowingly combine, conspire, and agree with other persons, known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, that is:

      a.      to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud, a violation of 18 U.S.C. § 1343, and mail fraud, a violation of 18 U.S.C. § 1341, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b.      to knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds from a place in the United States to a place outside the United States, knowing that the funds involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, that is, wire fraud, a violation of 18 U.S.C. § 1343, and mail fraud, a violation of 18 U.S.C. § 1341, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

c.      to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, wire fraud, a violation of 18 U.S.C. § 1343, and mail fraud, a violation of 18 U.S.C. § 1341, in violation of 18 U.S.C. § 1957.

### Manner and Means of the Conspiracy

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

3.      To achieve the goals of the conspiracy, the defendants' co-conspirators, through false and fraudulent pretenses, representations, and promises, and concealment of

material facts, persuaded victims to deposit, wire, transfer funds into bank accounts, mail funds to designated addresses, or hand deliver funds to conspirators.

4.      At times, the defendants' co-conspirators would fraudulently induce victims to deposit funds from romance scams, business email compromises, and real estate scams, or other fraudulent schemes into designated bank accounts.

5.      At other times, the defendants' co-conspirators would fraudulently induce victims to send funds from romance scams, business email compromises, and real estate scams, or other fraudulent schemes to designated mailing addresses.

6.      At other times, the defendants' co-conspirators would fraudulently induce victims and others to hand deliver cash proceeds from romance scams, business email compromises, and real estate scams, or other fraudulent schemes to designated individuals.

7.      The defendants reached agreements with co-conspirators regarding the percentage of fraudulently-obtained funds that their co-conspirators would receive for their receiving and laundering services.

8.      The defendants and their co-conspirators opened bank accounts specifically to launder funds.  The defendants and their co-conspirators would transfer these funds to different accounts immediately upon receipt in attempts to avoid bank and law enforcement scrutiny.

9.      At times, the defendants' co-conspirators requested the bank account information for a bank account, which could receive the fraudulently-obtained funds.

10.     At other times, the defendants and their co-conspirators caused a bank account or money service account to be opened, which could receive the fraudulently-obtained funds.

11.     The defendants sent their co-conspirators account information for their bank accounts that could be used to receive fraudulently-obtained funds.  For such accounts, the defendants would, at a minimum, include the name on the account, address, the account numbers, and the routing numbers.

12.     The defendants and their co-conspirators made false and fraudulent statements, representations, and promises, and concealed material facts, in order to avoid discovery of the fraudulent nature of deposits, wires, and transfers, such as providing instructions to co-conspirators and victims to label wire transfers as "loan repayments" and "advertising."

13.     The defendants and their co-conspirators also made false and fraudulent statements, representations, and promises, and concealed material facts when completing account opening documents and when communicating with financial institutions and cryptocurrency exchanges.

14.     The defendants converted the funds from romance scams, business email compromises, and real estate scams, or other fraudulent schemes into BTC and other cryptocurrencies and sent the BTC and other cryptocurrencies to cryptocurrency accounts controlled by foreign and domestic co-conspirators.

15.     The defendants had multiple bank accounts closed by banks due to suspicious activity and suspected cryptocurrency trading.

16.   On or about February 16, 2021:

    a.   **Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 6%.

    b.   The individual sent $76,155.33 via wire transfer from a bank account in the Eastern District of Texas.  Per instructions from **Nysewander**, the amount sent was to be an odd number, and the wire was to be labeled as a "loan repayment."  The wire transfer was sent per **Nysewander's** instructions to **Randall V. Rule's** Ageless Partners LLC bank account at Ameris Bank.  **Rule** was identified as the sole signature authority for the account.

    c.   Shortly thereafter, **Rule** combined these funds with additional funds, and wired $94,122.00 to a Utah-based company, where he purchased BTC.

    d.   Later that day, the BTC was transferred into a cryptocurrency account controlled by an individual in the Eastern District of Texas.

17.   On or about March 4, 2021:

    a.   Victim P.D., of Saint Simons Island, Georgia, wired $298,500 into **Randall V. Rule's** Ageless Partners LLC bank account at Ameris Bank.  P.D. was a victim of real estate scam.

    b.   **Rule** received the wire transfer and transferred the victim funds to his personal checking account at Ameris Bank.

      c.  **Rule** then commingled the victim funds with funds wired into his account from **Gregory C. Nysewander** and another co-conspirator.

      d.  Then, **Rule** wired $315,458 to the cryptocurrency trading platform Gemini, where he purchased BTC.

18.    Over the next several days, the BTC was transferred into various cryptocurrency accounts controlled by foreign and domestic co-conspirators.

19.    On or about April 14, 2021:

      a.  Victim G.S., of Odessa, Florida, wired $181,000 into **Randall V. Rule's** Ageless Partners LLC bank account at Ameris Bank. G.S. was a victim of a romance scam.

      b.  Victim W.R., of Byron, Georgia, wired $40,019 into **Rule's** Ageless Partners LLC bank account at Ameris Bank. W.R. was also a victim of a romance scam.

      c.  **Rule** commingled the victim funds and transferred these funds in three separate transfers of $90,000, $89,000, and $80,000, respectively, to his personal checking account at Ameris Bank.

      d.  Then, **Rule** wired these funds to Gemini, where he purchased BTC.

20.    Over the next several days, the BTC was transferred into various cryptocurrency accounts controlled by foreign and domestic co-conspirators.

21.　On or about April 28, 2021:

    a.　**Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 5%.

    b.　The individual sent $119,214.96 via wire transfer from a bank account in the Eastern District of Texas.  Per instructions from **Nysewander**, the amount sent was to be an odd number, and the wire was to be labeled as a "loan repayment."  The wire transfer was sent per **Nysewander's** instructions to **Rule's** Ageless Partners LLC bank account at Ameris Bank.

    c.　Shortly thereafter, **Randall V. Rule** transferred $117,000 to his personal checking account at Ameris Bank.

22.　On or about April 29, 2021:

    a.　**Randall V. Rule** sent a $116,200 wire transfer from his personal checking account at Ameris Bank to Gemini.

    b.　Later that day, these funds were converted to BTC and transferred into a cryptocurrency account controlled by an individual in the Eastern District of Texas.

23.　On or about May 4, 2021:

    a.　**Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 5%.

    b.   The individual sent $111,236.57 via wire transfer from a bank account in the Eastern District of Texas.  Per instructions from **Nysewander**, the amount sent was to be an odd number, and the wire was to be labeled as a "loan repayment."  The wire transfer was sent per **Nysewander's** instructions to **Rule's** Ageless Partners LLC bank account at Ameris Bank.

    c.   Shortly thereafter, **Randall V. Rule** transferred $108,500 to his personal checking account at Ameris Bank.

    d.   Then, **Randall V. Rule** sent a $108,400 wire transfer from his personal checking account at Ameris Bank to Gemini.

    e.   Later that day, these funds were converted to BTC and Ethereum (ETH) and transferred into cryptocurrency accounts controlled by an individual in the Eastern District of Texas.

24.    On or about May 11, 2021:

    a.   **Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 5%.

    b.   The individual sent $179,387.28 via wire transfer from a bank account in the Eastern District of Texas.  The wire transfer was labeled as a "REPAIR LOAN."  The wire transfer was sent per **Nysewander's** instructions to **Rule's** Ageless Partners LLC bank account at Ameris Bank.

      c.  Shortly thereafter, **Randall V. Rule** transferred $99,900 and $89,500, respectively, to his personal checking account at Ameris Bank.

25.    On or about May 12, 2021:

      a.  **Randall V Rule** sent a $140,200 wire transfer from his personal checking account at Ameris Bank to Gemini.

      b.  Later that day, these funds were converted to BTC and ETH and transferred into cryptocurrency accounts controlled by an individual in the Eastern District of Texas.

26.    On or about May 18, 2021:

      a.  **Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 5%.

      b.  The individual sent $254,372.81 via wire transfer from a bank account in the Eastern District of Texas.  The wire transfer was sent per **Nysewander's** instructions to **Rule's** Ageless Partners LLC bank account at Ameris Bank.

      c.  Shortly thereafter, **Rule** transferred $246,000 to his personal checking account at Ameris Bank.

27.    On May 19, 2021:

      a.  **Randall V. Rule** sent a $246,000 wire transfer from his personal checking account at Ameris Bank to Gemini.

       b.  Later that day, these funds were converted to BTC and transferred into a cryptocurrency account controlled by an individual in the Eastern District of Texas.

28.    On or about June 7, 2021:

       a.  Victim J.M., of Hiram, Georgia, received unsolicited wire transfers into her Wells Fargo checking account from individuals she did not know.  One of the wire transfers she received was from Victim P.D.  J.M. was a victim of a romance scam.  P.D. was a victim of a real estate scam.

       b.  Specifically, J.M. received instructions to wire $9,960.00 to Ageless Partners LLC as a "Repayment of Loan Randall V Rule."  J.M. sent this wire as instructed.

       c.  **Randall V. Rule** received the funds and transferred them to his personal checking account at Ameris Bank.

29.    On or about June 8, 2021, **Randall V. Rule** wired these funds to Gemini, where he purchased BTC.

30.    Over the next several days, the BTC was transferred into various cryptocurrency accounts controlled by foreign and domestic co-conspirators.

31.    On or about October 21, 2021:

       a.  **Gregory C. Nysewander** negotiated a transaction with an individual in the Eastern District of Texas to convert a wire transfer to BTC for a fee of 5%.

    b.  The individual sent $19,056.57 via wire transfer from a bank account in the Eastern District of Texas.  Per instructions from **Nysewander**, the amount sent was to be an odd number, and the wire was to be labeled as a "loan repayment."  The wire transfer was sent per **Nysewander's** instructions to **Randall V. Rule's** bank account at AFCU.

    c.  Shortly thereafter, **Rule** wired $18,000.00 to the cryptocurrency trading platform Kraken, where he purchased BTC.

    d.  Later that day, the BTC was transferred into a cryptocurrency account controlled by an individual in the Eastern District of Texas.

32.    On November 19, 2021, **Gregory C. Nysewander** drove to Plano, Texas, and met with an individual to discuss an ongoing business relationship he wanted to continue to build with the individual.  **Nysewander** advised that he would pay the individual a commission for every customer he referred who purchased BTC from **Randall V. Rule** and other co-conspirators.  The individual informed **Nysewander** that the funds that would be used to purchase BTC were derived from criminal activity.  **Nysewander** indicated that he understood and stated that he wanted to conduct transactions with the individual.

33.    On or about January 13, 2022:

    a.  **Gregory C. Nysewander** negotiated a trade of BTC for cash in the amount of $20,000 to be sent via U.S. Mail.

    b.  **Nysewander** set a fee of 10% to be split in 2.5% increments to **Randall V. Rule,** co-conspirators in South Carolina, and the individual.

    c.  $20,000 in cash was delivered via Express Mail to the co-conspirators' business address, in Irmo, South Carolina.

    d.  Co-conspirators wired $18,005.27 to **Rule's** bank account at Stockman Bank.

    e.  **Rule** received the wire transfer of $18,005.27 and sent $17,080.00 to Kraken, where he purchased BTC.

    f.  The BTC was transferred into the co-conspirator's BTC account.

34.    On or about January 25, 2022, co-conspirators transferred BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas.

35.    During the course of the conspiracy, **Randall V. Rule** and **Gregory C. Nysewander** laundered at least $2,403,550 in victim funds.

All in violation of 18 U.S.C. § 1956(h).

## COUNTS 2-11

Violation:
18 U.S.C. §§ 1956(a)(1)(B)(i) and 2
(Money Laundering and Aiding and
Abetting)

1.      The General Allegations section of this indictment is realleged and
incorporated by reference as though fully set forth herein.

2.      On the dates set forth below, in the Eastern District of Texas, and elsewhere,
the defendants, **Randall V. Rule** and **Gregory C. Nysewander**, did knowingly conduct and
attempt to conduct a financial transaction affecting interstate commerce and foreign
commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud,
a violation of 18 U.S.C. § 1343, and mail fraud, a violation of 18 U.S.C. § 1341, knowing
that the transaction was designed in whole and in part to conceal and disguise the nature,
location, source, ownership, and control of the proceeds of specified unlawful activity, and
that while conducting and attempting to conduct such financial transaction, knew that the
property involved in the financial transaction represented the proceeds of some form of
unlawful activity.

| Count | Date | Financial Transaction |
|:---:|:---:|:---:|
| 2 | 2/16/2021 | Wire transfer of $76,155.33 from a bank account in the Eastern District of Texas to **Rule's** Ageless Partners LLC bank account at Ameris Bank |
| 3 | 2/16/2021 | Transfer of BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas |
| 4 | 4/28/2021 | Wire transfer of $119,214.96 from a bank account in the Eastern District of Texas to **Rule's** Ageless Partners LLC bank account at Ameris Bank |
| 5 | 4/28/2021 | Transfer of BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas |
| 6 | 5/4/2021 | Wire transfer of $111,236.57 from a bank account in the Eastern District of Texas to **Rule's** Ageless Partners LLC bank account at Ameris Bank |
| 7 | 5/4/2021 | Transfer of BTC and ETH into cryptocurrency accounts controlled by an individual in the Eastern District of Texas |
| 8 | 5/11/2021 | Wire transfer of $179,387.28 from a bank account in the Eastern District of Texas to **Rule's** Ageless Partners LLC bank account at Ameris Bank |
| 9 | 5/12/2021 | Transfer of BTC and ETH into cryptocurrency accounts controlled by an individual in the Eastern District of Texas |
| 10 | 5/18/2021 | Wire transfer of $254,372.81 from a bank account in the Eastern District of Texas to **Rule's** Ageless Partners LLC bank account at Ameris Bank |
| 11 | 5/19/2021 | Transfer of BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas |

All in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.

## COUNTS 12-14

Violation:
18 U.S.C. §§ 1956(a)(3)(B) and 2
(Money Laundering and Aiding and
Abetting)

1.      The General Allegations section of this indictment is realleged and incorporated by reference as though fully set forth herein.

2.      On the dates set forth below, in the Eastern District of Texas, and elsewhere, the defendants, **Randall V. Rule** and **Gregory C. Nysewander**, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving proceeds represented to be proceeds of specified unlawful activity, that is, wire fraud, a violation of 18 U.S.C. § 1343, and mail fraud, a violation of 18 U.S.C. § 1341.

| Count | Date | Financial Transaction |
|:---:|:---:|:---:|
| **12** | 10/21/2021 | Wire transfer of $19,056.57 from a bank account in the Eastern District of Texas to **Rule's** bank account at AFCU |
| **13** | 10/21/2021 | Transfer of BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas |
| **14** | 1/25/2022 | Transfer of BTC into a cryptocurrency account controlled by an individual in the Eastern District of Texas |

All in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 2.

## COUNT 15

<u>Violation</u>:  18 U.S.C. § 371
(Conspiracy to Violate the
Bank Secrecy Act)

## Introduction

1.     The General Allegations sections of this indictment are realleged and incorporated by reference as though fully set forth herein.

2.     The defendants' business was a "financial institution" as defined by 31 U.S.C. § 5312(2)(J), namely a currency exchange, or a business engaged in the exchange of currency, funds, or value that substitutes for currency or funds, and 31 U.S.C. § 5312(2)(R), namely a licensed sender of money or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.

3.     The defendants' business was also a "financial institution" as defined by 31 C.F.R. § 1010.100(t), namely a money services business as defined by 31 C.F.R. § 1010.100(ff).

4.     The defendants did not comply with the money services business requirements under Title 31, Subtitle IV, Chapter 53, Subchapter II or the regulations prescribed or orders issued under Title 31, Subtitle IV, Chapter 53, Subchapter II.

5.     The defendants did not file Currency Transaction Reports as required by 31 U.S.C. § 5313(a) and 31 C.F.R. § 1010.311.

6.      The defendants did not file Suspicious Activity Reports as required by 31 U.S.C. § 5318(g) and 31 C.F.R. § 1022.320.

7.      The defendants did not develop, implement, or maintain an effective anti-money laundering program as required by 31 U.S.C. § 5318(h) and 31 C.F.R. § 1022.210.

### The Conspiracy

8.      From in or about January 2020, and continuing through in or about March 2022, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the defendants, **Randall V. Rule** and **Gregory C. Nysewander**, did knowingly combine, conspire, and agree with each other and with other persons, both known and unknown to the Grand Jury, to commit and abet certain offenses against the United States in violation of 31 U.S.C. § 5322(a), that is:

> willfully violating Title 31, Subtitle IV, Chapter 53, Subchapter II or a regulation prescribed or order issued under Title 31, Subtitle IV, Chapter 53, Subchapter II.

### Purpose of the Conspiracy

9.      It was the purpose of the conspiracy for the defendants and their co-conspirators to operate a money services business in violation of the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., in order to unlawfully and unjustly enrich themselves by transmitting funds on behalf of others.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

10.     To achieve the goals of their conspiracy, **Randall V. Rule** opened and controlled multiple bank accounts and cryptocurrency exchange accounts, under false and fictitious pretenses, in order to operate a money services business, namely a money transmission service.

11.     **Randall V. Rule** and **Gregory C. Nysewander's** money transmission service provided others with the ability to launder criminal proceeds obtained through various schemes.

12.     Customers would make deposits, usually via wire transfer, or would induce victims to make deposits into bank accounts belonging to **Randall V. Rule**.  In exchange for the deposits, **Rule** and **Nysewander** would provide BTC and other cryptocurrencies to their customers.

13.     **Rule** perpetuated the conspiracy by opening and using multiple bank accounts at different financial institutions in attempts to avoid bank and law enforcement scrutiny.

14.     The defendants and their co-conspirators made false and fraudulent statements, representations, and promises, and concealed material facts, in order to avoid discovery of the fraudulent nature of deposits, wires, and transfers, such as providing instructions to customers and victims to label wire transfers as "loan repayments" and "advertising."

15.     The defendants and their co-conspirators also made false and fraudulent statements, representations, and promises, and concealed material facts when completing account opening documents and when communicating with financial institutions and cryptocurrency exchanges.

16.     The defendants converted the funds from romance scams, business email compromises, and real estate scams, or other fraudulent schemes into BTC and other cryptocurrencies and sent the BTC and other cryptocurrencies to cryptocurrency accounts controlled by foreign and domestic co-conspirators.

~~17.     **Rule** had multiple bank accounts closed by banks due to suspicious activity~~ and suspected cryptocurrency trading.

18.     It was part of the conspiracy that the defendants did not comply with the money services business requirements under Title 31, Subtitle IV, Chapter 53, Subchapter II or the regulations prescribed or orders issued under Title 31, Subtitle IV, Chapter 53, Subchapter II.

19.     It was part of the conspiracy that the defendants did not file Currency Transaction Reports as required by 31 U.S.C. § 5313(a) and 31 C.F.R. § 1010.311.

20.     It was part of the conspiracy that the defendants did not file Suspicious Activity Reports as required by 31 U.S.C. § 5318(g) and 31 C.F.R. § 1022.320.

21.     It was part of the conspiracy that the defendants did not develop, implement, or maintain an effective anti-money laundering program as required by 31 U.S.C. § 5318(h) and 31 C.F.R. § 1022.210.

## Overt Acts

In furtherance of the conspiracy and to achieve its objects and purpose, the following overt acts, among others, were committed in the Eastern District of Texas and elsewhere:

22.     Paragraphs 16-34 of Count 1 of this indictment are realleged and incorporated by reference as though fully set forth herein, as constituting and describing the overt acts committed in furtherance of the conspiracy and to achieve its objects and purpose.

All in violation of 18 U.S.C. § 371.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
### Pursuant to 18 U.S.C. § 982(a)(1)

1.      The allegations contained in Counts 1-14 are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.      Upon conviction of any violation of 18 U.S.C. §§ 1956 or 1957, the defendants, **Randall V. Rule** and **Gregory C. Nysewander**, shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).

3.      The property which is subject to forfeiture, includes but is not limited to the following:

      a.   <u>Cash Proceeds</u>

          A sum of money equal to $2,403,550.00 in United States currency, and all interest and proceeds traceable thereto, representing the proceeds of the offense or the amount of property involved in the offense alleged in the indictment, for which the defendants are personally liable;

      b.   342 silver coins;

      c.   16 silver bars;

      d.   One gold coin;

      e.   One gold bar;

      f.   All funds and credits, including cryptocurrencies, private keys, recovery seeds, or passwords that may be necessary to access cryptocurrency funds and credits, stored in or accessible via cryptocurrency wallets owned or controlled by **Randall V. Rule** and **Gregory C. Nysewander**;

g.  All virtual currency, derived from and/or associated, with devices, storage methods, and softwares, including cold storage devices, paper wallets, software wallets, and ledgers associated with virtual currencies owned or controlled by **Randall V. Rule** and **Gregory C. Nysewander**; and

h.  Passwords, encryption keys, passcodes, and other access devices that may be necessary to access secured areas or items associate with virtual currencies owned or controlled by **Randall V. Rule** and **Gregory C. Nysewander**.

4.      Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendants:

a.  Cannot be located upon the exercise of due diligence;

b.  Has been transferred, or sold to, or deposited with a third party;

c.  Has been placed beyond the jurisdiction of the Court;

d.  Has been substantially diminished in value; or

e.  Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of **Randall V. Rule** and **Gregory C. Nysewander**.

By virtue of the commission of the offenses alleged in this indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 982(a)(1).

All pursuant to 18 U.S.C. § 982(a)(1), and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

GRAND JURY FOREPERSON


11-16-2022

Date


BRIT FEATHERSTON
UNITED STATES ATTORNEY

NATHANIEL C. KUMMERFELD
ASSISTANT UNITED STATES ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 6:22-CR-64 |
| | § | JUDGE JDK/JDL |
| RANDALL V. RULE (01) | § | |
| GREGORY C. NYSEWANDER (02) | § | |

## **NOTICE OF PENALTY**

### **COUNT 1**

VIOLATION:            18 U.S.C. § 1956(h)
                     Conspiracy to Commit Money Laundering

PENALTY:             Imprisonment of not more than twenty (20) years; the greater of
                     a fine not to exceed $500,000 or twice the value of the monetary
                     instrument or funds involved in the transportation, transmission,
                     or transfer, whichever is greater, or both such imprisonment and
                     fine; and a term of supervised release of not more than three (3)
                     years.

SPECIAL ASSESSMENT: $100.00

### **COUNTS 2-11**

VIOLATION:            18 U.S.C. §§ 1956(a)(1)(B)(i) and 2
                     Money Laundering and Aiding and Abetting

PENALTY:             Imprisonment of not more than twenty (20) years; the greater of
                     a fine not to exceed $500,000 or twice the value of the monetary
                     instrument or funds involved in the transportation, transmission,
                     or transfer, whichever is greater, or both such imprisonment and
                     fine; and a term of supervised release of not more than three (3)
                     years.

SPECIAL ASSESSMENT: $100.00 each count

## COUNTS 12-14

VIOLATION:         18 U.S.C. §§ 1956(a)(3)(B) and 2
Money Laundering and Aiding and Abetting

PENALTY:         Imprisonment of not more than twenty (20) years; the greater of a fine not to exceed $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or both such imprisonment and fine; and a term of supervised release of not more than three (3) years.

SPECIAL ASSESSMENT: $100.00 each count

## COUNT 15

VIOLATION:         18 U.S.C. § 371
Conspiracy to Violate the Bank Secrecy Act

PENALTY:         Imprisonment of not more than five (5) years; the greater of a fine not to exceed $250,000, a fine not to exceed two times the gross gain to the Defendant, or a fine not to exceed two times the loss to the victim, or both such imprisonment and fine; and a term of supervised release of not more than three (3) years.

SPECIAL ASSESSMENT: $100.00